COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-456-CR

 

 

ALFREDO LEYVA PECINA                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

In four issues, appellant
Alfredo Leyva Pecina appeals his conviction for the murder of his wife.  We affirm.

BACKGROUND








Appellant and his wife,
Michelle Arias, lived with her father and her sister, Gabriela Arias, in an
apartment in Arlington.  Gabriela found
Michelle=s body when she returned to the apartment after work.  Michelle had been stabbed and cut around
fifty‑five times.  Appellant,
bleeding from stab wounds, was present when Gabriela found Michelle=s body.  Michelle died at the
scene.

Gabriela testified that she
left work around eight o=clock that
night to meet her sister at the apartment for a concert they planned to attend
that night. She found Michelle lying on the floor of the bedroom Michelle and
Appellant shared.  She looked for the
phone to call 911 and then saw Appellant, covered with a blanket, next to
Michelle.  She testified that he stood
up, looked angry, and came towards her in a manner that made her think he was
going to attack her. She threw the phone at him and ran to a neighbor=s apartment.  The neighbor, Luis
Cardoso, also testified at trial.  He
called 911 and accompanied Gabriela back to the apartment.  A recording of the 911 call that Cardoso made
was played for the jury.

Cardoso testified that
Appellant was resting face down halfway between the bedroom and the
hallway.  Cardoso testified that he saw
Appellant open his eyes when he walked past and that he believed Appellant was
a threat, so he went back to his apartment for help and brought back two of his
brothers‑in‑law and his oldest son. 
Other testimony at trial indicated that Appellant and his wife had been
having marital problems.








The trial court denied
Appellant=s motion to
suppress his oral and written statements to the police and read his findings of
fact and conclusions of law into the record. 
In the taped confession to the police, Appellant stated that he did not
remember much that happened that day, but that he had not used drugs or alcohol
and that he and Michelle had fought because she was going out that night
without him.  They argued about her not
wanting to be with him.  When asked if he
had cut Michelle, Appellant said, A[Y]es,@ and
explained that they had been struggling. 
The English translation of the interview was read to the jury at trial.

The English translation of
Appellant=s written
statement, taken down in Spanish by one of the detectives and signed by
Appellant, was also read to the jury:

This
past Friday I was arguing with my wife, Michelle.  She was to go out, but she did not want me to
go.  Also[,] she said to me that she did
not want to be with me.  I became angry,
and we began to fight.  She also told me
that I did not have papers.  Also, she
said to me that here is not like in Mexico. 
I was not thinking things through . . . It was over, and I did not
leave.  I stayed in the apartment.  I picked up the knife from the kitchen.  I do not remember how many times I cut
Michelle, but I know there were many times. 
I thought that Michelle was alive. 
Also, I do not remember cutting myself. 
Also, I did not see Gabby.  This
evening, I did not use drugs or alcohol. 
I asked for a lawyer, but I also wanted to talk with the Arlington
police.

 








Todd Roper, one of the
firefighter paramedics who responded to the 911 call, described the scene in
the apartment bedroom as 

extremely
bloody.  There was blood six, seven foot
high around the walls[,] on most of the furniture, a large amount around both
victims that we saw at that point.  Both
the man in the doorway and the young lady across the room, both had large
amounts of blood around them.

 

Photographs of the scene were admitted into
evidence.  Appellant=s attorney objected to the photographs depicted in State=s exhibits 9-28, arguing that they were unduly cumulative and that
their prejudicial effect outweighed their probative value.  See Tex.
R. Evid. 403.  The trial judge
overruled these objections, and the State published these photographs to the
jury.








At trial, evidence was
introduced that DNA from a third person was collected from the mirror in the
area connecting the bedroom and bathroom, and that an unknown person=s fingerprint was found on the knife. 
Pete Salicco, a latent print examiner with the Arlington Police
Department, testified that he compared the fingerprint on the knife to
Appellant, Michelle, and Gabriela, and that he was not able to make a match.  The knife was not tested for DNA.  However, there was no shortage of potential
DNA or fingerprint donors.  Roper
described approaching the apartment as hectic, with lots of people milling
around outside, and inside the apartment, Aa number of people in various states of what I would say, hysteria,
just generally upset.@  He testified that he and another firefighter
went into the bedroom and checked Michelle=s and Appellant=s
injuries.  Cardoso brought his son and
two brothers‑in‑law back to the apartment, and testified that his
son might have gone in the bedroom but that he did not know if his son had
touched anything.  Cardoso added that he
might have touched the walls, but not anywhere there was any blood, and that he
did go into the bedroom, but did not touch anything.

Officer Harris, who secured
the knife, testified that she was aware that the knife had been moved before
she arrived.  Detective Nutt testified
that many people might have handled the knife prior to the arrival of the
police and that the crime scene was unsecure for several minutes.

MOTION TO SUPPRESS

In his first and fourth
issues, Appellant complains that the trial court erred by overruling his motion
to suppress his confession because the statement was obtained in violation of
his right to counsel and because the police failed to notify the Mexican
consulate of Appellant=s arrest and
detention, in violation of the Vienna Convention.[2]








Standard Of Review








We review a trial court=s ruling on a motion to suppress evidence under a bifurcated standard
of review.  Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997).  In reviewing the
trial court=s decision,
we do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim.
App. 1999).  Therefore, we give almost
total deference to the trial court=s rulings on (1) questions of historical fact, even if the trial court=s determination of those facts was not based on an evaluation of
credibility and demeanor, and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Montanez v. State, 195 S.W.3d 101, 108‑09
(Tex. Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004, pet. ref=d).  But when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court=s rulings on mixed questions of law and fact.  Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652‑53.

Stated another way, when
reviewing the trial court=s ruling on
a motion to suppress, we must view the evidence in the light most favorable to
the trial court=s
ruling.  State v. Kelly, 204
S.W.3d 808, 818 (Tex. Crim. App. 2006). 
When the trial court makes explicit fact findings, we determine whether
the evidence, when viewed in the light most favorable to the trial court=s ruling, supports those fact findings.  Id. at 818‑19.  We then review the trial court=s legal ruling de novo unless its explicit fact findings that are
supported by the record are also dispositive of the legal ruling.  Id. at 819.  We must uphold the trial court=s ruling if it is supported by the record and correct under any theory
of law applicable to the case even if the trial court gave the wrong reason for
its ruling.  Armendariz v. State,
123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 974
(2004); Ross, 32 S.W.3d at 856; Romero, 800 S.W.2d at 543.

Suppression Hearing Findings

The trial judge made the
following oral findings of fact and conclusions of law[3]
at the conclusion of the suppression hearing:








[Appellant]
had been read his rights by Judge Maddock at the . . . [h]ospital, . . . he was
informed of his rights to have a lawyer, to hire a lawyer, to have one
appointed to him, that if he could not afford one, one would be appointed, that
he had a right to remain silent, that he did not have to speak to the police,
that he=s not
required to make a statement, and any statement that he made could be held
against him in a court of law.

 

He had a right to stop the interview or questioning
at any time, that he had a right to have an examiner at the trial if he wishes
to have one, and that he was also subject to deportation if he was not a U.S.
citizen, that this was translated to [Appellant] in Spanish by Judge Maddock,
who was fluent in Spanish, being a  . . .
Cuban national, that likewise, [Appellant] indicated that although he did want
a lawyer, that he wished to also talk with detectives from Arlington, meaning
that he basically was waiving his rights at that time when he requested to have
the detective speak to him, that the detectives likewise talked with him,
Detective Nutt and Detective Frias, . . . who was a Spanish speaker and
interpreted everything concerning his rights.

 

And once again, he was given his rights again,
wherein he decided that he would talk with the detectives concerning the
incident that was involved in the death of his wife, Michelle Arias.

 








That he did, in fact, sign various waivers of
counsel, did not seem that he was under the influence of any intoxicants, be it
drugs or alcohol, that he, in fact, gave a statement that was recorded as well
as placed in writing, and that as such he was also, upon being placed in the
Tarrant County Jail, given a document stating whether or not he wished to discuss
anything with the Mexican Consulate.  He
at that time stated that he did not.

 

And based upon all of the above, the Court=s
going to make a finding that the statement was taken voluntarily, and as such
it=s
going to be admissible.

 

Arlington municipal court judge Rosalia Maddock,
Detectives Nutt and Frias, and Appellant testified at the suppression hearing.[4]

Vienna Convention

On arrest, authorities must
notify a foreign national that he has a right to contact his consulate.  See Vienna Convention on Consular
Relations, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 100‑101, available
at
http://untreaty.un.org/ilc/texts/instruments/english/conventions/9_2_1963.pdf.  However, because the court of criminal
appeals has held that suppression is not an appropriate remedy for violations
of the Vienna Convention, we overrule Appellant=s fourth issue.  Sierra v.
State, No. PD‑453‑05, 2007 WL 840483, at *3 (Tex. Crim. App.
Mar. 21, 2007); see also Sanchez‑Llamas v. Oregon, 126 S. Ct.
2669, 2674, 2681-82 (2006) (stating that Vienna convention and








federal exclusionary rule precedent did not
support suppression as an appropriate remedy for article 36 violations because
foreign nationals detained in the U.S. already enjoy due process and Fifth and
Sixth Amendment protections).

Right To Counsel

A statement of an accused may
be used in evidence against him if it appears that it was freely and
voluntarily made without compulsion or persuasion.  See Tex.
Code Crim. Proc. Ann. art. 38.21 (Vernon 2005).  A written statement made by the accused is
not admissible unless he received  the
proper warnings from a magistrate and, prior to making the statement,
knowingly, intelligently, and voluntarily waived those rights.  Id.
art. 38.22, ' 2.  The same warnings are required for an oral
statement.  Id. ' 3(a)(2). Because Appellant argues that his right to counsel was
violated and refers us to both Fifth and Sixth Amendment cases, and because the
trial judge stated only that Appellant waived his rights, we will address his
right to counsel under both the Fifth and Sixth Amendments.[5]  See U.S.
Const. amends. V, VI; Miranda v. Arizona, 384 U.S. 436, 444-45,
86 S. Ct. 1602, 1612 (1966).








Fifth Amendment Right To Counsel (Miranda)

In certain pretrial settings,
the Fifth Amendment privilege against compulsory self‑incrimination
requires that if a custodial interrogation continues without the presence of an
attorney and results in a statement being taken, the State has the burden to
show that the defendant knowingly and intelligently waived his right to
counsel.  Miranda, 384 U.S. at
475, 86 S. Ct. at 1628.  Such a waiver
must be proven by a preponderance of the evidence.  Colorado v. Connally, 479 U.S. 157,
168, 107 S. Ct. 515, 522 (1986).  If the
State shows that a suspect=s decision not to rely on his Miranda rights was uncoerced,
that he at all times knew he could stand mute and consult a lawyer, and that he
was aware the State could use his statements against him, the State=s burden of proof is met and waiver is shown as a matter of law.  Moran v. Burbine, 475 U.S. 412, 422‑423,
106 S. Ct. 1135, 1141 (1986); see also Robinson v. State, 851 S.W.2d
216, 223 (Tex. Crim. App. 1991), cert. denied, 512 U.S. 1246 (1994).








If a suspect in custody has
clearly asserted his right to counsel, interrogation must cease and may begin
again only if Acounsel has
been made available . . . [or] the accused himself initiates further
communication, exchanges, or conversations with the police.@  Edwards v. Arizona, 451
U.S. 477, 484‑85, 101 S. Ct. 1880, 1884‑85 (1981); see Cross v.
State, 144 S.W.3d 521, 526‑27 (Tex. Crim. App. 2004).  However, unlike the right to counsel under
the Sixth Amendment, which attaches automatically, the Fifth Amendment right to
counsel will attach only when affirmatively invoked by the accused.  See Davis v. United States, 512 U.S.
452, 456‑57, 459, 114 S. Ct. 2350, 2354-55 (1994).  Such an invocation must be clear and
unambiguous.  Dinkins v. State,
894 S.W.2d 330, 351-52 (Tex. Crim. App. 1995), cert. denied, 516 U.S.
832 (1995).  The right to counsel is
considered invoked when the accused indicates that he wants to speak to an
attorney or have an attorney present during questioning.  Lucas v. State, 791 S.W.2d 35, 45
(Tex. Crim. App. 1989), cert. dism=d, 524 U.S. 965 (1998).  The Fifth Amendment bars only compulsory self‑incrimination;
it does not bar unwise confessions. Holloway v. State, 780 S.W.2d 787,
792 (Tex. Crim. App. 1989).

Judge Maddock testified that
she introduced herself to Appellant, told him that the two officers wanted to
talk with him, and then read him his rights in Spanish.[6]  These rights included the following specific
language:








(2)
You have a right to hire a lawyer and have him/her present prior to and during
any interview and questioning by peace officers or attorneys representing the
[S]tate;

 

(3)
If you cannot afford a lawyer, you have the right to request the appointment of
a lawyer to be present prior to and during any such interview and you have the
right to have an attorney appointed to represent you if you cannot afford an
attorney.  This means you may obtain your
own lawyer or have a lawyer appointed for you. 
You may have reasonable time and opportunity to consult your lawyer if
you desire.  In the event you want an
attorney appointed for you, you will be asked to complete a written form that
contains questions about your financial resources.  You will be provided with the forms needed to
make a request for an attorney.  If you
need help completing the forms, assistance will be provided for you;

 

(4)
You have the right to remain silent.  You
do not have to speak to the police;

 

(5)
You are not required to make a statement, and any statement you make can and
may be used against you in court;

 

(6)
You have the right to stop any interviewing or questioning at any time.  If you decide to answer questions, you may
stop the questioning at any time[.]

 








Judge Maddock testified that after she had
Appellant sign the warnings, she asked him if he wanted a court‑appointed
attorney, and he indicated that he did. 
She then asked him if he still wanted to speak to the detectives, and he
said, A[Y]es.@ She
testified that his decision to speak with the detectives appeared to be free,
intelligent, knowing, and voluntary, that there had been no coercion, and that
it appeared to her that he wanted a court‑appointed attorney for the
court proceedings.[7]








Detective Nutt testified that
he and Detective Frias left Judge Maddock to arraign Appellant after
introducing themselves and re-entered the room after Judge Maddock informed
them that Appellant had requested an attorney and to speak with them.  He also testified that prior to taking
Appellant=s statement,
Appellant did not appear to be under the influence of any drugs or medication
and that he checked with the nurse, who informed him that Appellant had not
been on any type of pain medication in the previous twenty‑four hours.
Detective Nutt said that Detective Frias explained to Appellant in Spanish who
they were and why they were there, and Aat that point in time he did say he wanted to talk to us, and we
advised him that we were going to record the interview.@  He further testified that
Detective Frias asked Appellant to sign the waiver of counsel form prior to
giving the interview, which Appellant did. Detective Frias noted on the form,
in Spanish, AI asked for
a lawyer but also I wanted to speak with the Arlington police.@

They read Appellant his
rights in Spanish twiceConce before
starting to record the interview, and again after noticing that the recording
device failed to tape the first time. 
Detective Nutt testified that Detective Frias read Appellant his Miranda
rights in Spanish on the recording and had Appellant review and sign the bottom
of the standard Miranda Spanish language warnings card.  He testified that at no time did Appellant
ask to stop the interview or ask to visit with counsel first, that it appeared
to him that Appellant was making a knowing, intelligent, and voluntary waiver
of his rights when he agreed to speak to them, that Appellant=s demeanor was cooperative, and that he did not threaten Appellant or
make any promises in return for his cooperation.

Detective Frias testified
that Appellant knowingly, intelligently, and voluntarily waived his rights,
without any coercion, and agreed to speak with them.  He also testified that at no time during the
interview did Appellant request to terminate the interview or ask for an
attorney.[8]








Appellant=s testimony at the suppression hearing focused solely on the consular
issue, stating that he was a Mexican citizen, and that if he had been informed
of his rights under the Vienna Convention, he Awould have waited to first speak with the Mexican Consulate.@  When asked what he would have
done if the consulate had advised him to obtain an attorney, he indicated that
he would have done as they advised.  And
then he agreed that if an attorney had advised him not to talk to the police,
he would not have talked with them.[9]









The trial judge had the
discretion, based on Judge Maddock=s testimony, to conclude that Appellant was aware, after she read his
rights to him, that he could remain silent, consult a lawyer, and that the
State could use his statements against him. 
See Moran, 475 U.S. at 422‑23, 106 S. Ct. at 1141.  After receiving those warnings, he still
indicated that he wanted to speak with the detectives, who Mirandized him twice
during the questioning.  The detectives
testified that Appellant did not request the assistance of counsel during the interview
nor ask to end the interview.  In his
testimony at the suppression hearing, Appellant speculated, in hindsight, what
he would have done differently with regard to the advice of counsel.

On these facts, we conclude
that the trial court had the discretion to find that Appellant waived his right
to counsel: either by failing to invoke it, because nothing in the testimony at
the hearing or at trial clearly showed that Appellant indicated to Judge
Maddock or the detectives at the time of the interview that he wanted to speak
to an attorney about the questioning or to have one present during questioning,
or because he reinitiated the contact by answering, A[Y]es,@ when asked
by Judge Maddock if he still wanted to speak with the detectives and by telling
the detectives that he wanted to talk to them.  See Edwards, 451 U.S. at 484‑85, 101
S. Ct. at 1884-85; Lucas, 791 S.W.2d at 46.

Sixth Amendment Right To Counsel








The Sixth Amendment to the
U.S. Constitution provides that A[i]n all criminal prosecutions, the accused shall enjoy the right . .
. to have the Assistance of Counsel for his defense.@  U.S. Const. amend. VI. 
This right to counsel attaches at the formal initiation of adversary
judicial proceedings Awhether by
way of formal charge, preliminary hearing, indictment, information, or arraignment.@  Brewer v. Williams, 430
U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977); see also Robinson v. State,
851 S.W.2d 216, 224 (Tex. Crim. App. 1991), cert. denied., 512 U.S. 1246
(1994).  A defendant, taken before a
magistrate for an article 15.17 hearing after formal charges have been filed,
can invoke his Sixth Amendment right to counsel by seeking appointment of
counsel.  Kirk v. State, 199
S.W.3d 467, 477 (Tex. App.CFort Worth 2006, pet. ref=d); see also Hargrove v. State, 162 S.W.3d 313, 321 (Tex. App.CFort Worth 2005, pet. ref=d) (indicating that the adversarial process had begun when the
defendant was taken before a magistrate for his article 15.17 hearing after an
arrest warrant had been issued).








At the suppression hearing,
Detective Nutt testified that he brought Judge Maddock to the hospital because
he wanted to try to get Appellant arraigned before the detectives attempted to
interview him.  After the hearing, during
trial, he testified that after viewing the crime scene, he prepared an arrest
warrant for Appellant.  Judge Maddock
answered affirmatively at trial when asked whether the magistrate warnings were
the warnings required under article 15.17 of the code of criminal
procedure.  We conclude that formal
adversarial proceedings had begun against Appellant when Judge Maddock
arraigned him, such that his Sixth Amendment right to counsel had
attached.  See Brewer, 430 U.S. at
398, 97 S. Ct. at 1239; Kirk, 199 S.W.3d at 477; Hargrove, 162
S.W.3d at 321.  After Judge Maddock gave
him his warnings, Appellant=s request for a court-appointed attorney was sufficient to invoke his
Sixth Amendment right to counsel.  See
Kirk, 199 S.W.3d at 477; Hargrove, 162 S.W.3d at 321.








An accused who has been
admonished with Miranda warnings has been sufficiently apprised of the
nature of his Sixth Amendment rights, so a waiver on that basis is considered a
knowing and intelligent one.  See
Patterson v. Illinois, 487 U.S. 285, 296, 300, 108 S. Ct. 2389, 2397-99
(1988).  If an accused does request the
assistance of counsel after his Sixth Amendment right has attached, then the
police may not initiate any questioning of him or attempt to induce him to
waive his right to counsel unless counsel is first provided.  Michigan v. Jackson, 475 U.S. 625, 635‑636,
106 S. Ct. 1404, 1410‑1411 (1986) (extending the Edwards per se
exclusionary rule to the Sixth Amendment context).  But when an unrepresented accused knowingly
and intelligently makes the choice to Ago it alone@ in
interrogation and initiates the conversation, his uncounseled statements are
admissible.  See Patterson, 487
U.S. at 290 n.3, 291, 108 S. Ct. at 2393 n.3, 2394 (distinguishing between
waiver when an accused already has an attorney and when he does not, and
stating that waiver would be invalid if the accused already has an attorney
because A[o]nce an accused has a lawyer, a distinct set of constitutional
safeguards aimed at preserving the sanctity of the attorney‑client
relationship takes effect@); see
also Holloway, 780 S.W.2d at 795 (holding that when a relationship between
the accused and his attorney is established after the Sixth Amendment right
attaches, the Sixth Amendment precludes dissolution of that relationship in the
absence of counsel and that only through notice to defense counsel may
authorities initiate interrogation of an indicted and represented defendant).  Appellant=s trial attorney was appointed the day after Appellant=s meeting with the magistrate judge and the detectives.

We held in Kirk that
the same two-step analysis that the court of criminal appeals recognized in Cross
to show that an accused has waived his previously invoked right to counsel
under the Fifth Amendment applied equally to waiver of that right under the
Sixth Amendment.  See Cross, 144
S.W.3d at 526-27 (holding that State must show re-initiation and waiver after
right to counsel is invoked); Kirk, 199 S.W.3d at 476-77 (applying Cross
analysis to Sixth Amendment).  As in Kirk,
the State here had to prove that Appellant reinitiated contact after he
requested appointment of counsel at his article 15.17 hearing and that he then
validly waived his right to counsel.  See
Kirk, 199 S.W.3d at 476-77.








As discussed above, Judge
Maddock testified that she asked Appellant if he wanted a court‑appointed
attorney and then asked him if he still wanted to speak with the detectives and
that he said Ayes@ to both.  The detectives, who
had been informed by Judge Maddock that Appellant had asked for an attorney and
to speak with them, testified that Appellant told them that he wanted to talk
with them.  Appellant=s statement, AI asked for
a lawyer, but also I wanted to speak with the Arlington police,@ confirms that Appellant invoked his right to counsel, and then
re-initiated contact.  See Kirk,
199 S.W.3d at 478.  We must next
determine whether after re-initiating contact, Appellant validly waived his
Sixth Amendment right to counsel, as found by the trial court.

Appellant had been given his
warnings under article 15.17 and his Miranda rights twice, in Spanish,
before making his statement.  He
initialed the  police card with the Miranda
rights written in Spanish after reviewing them, and answered on the
recording that he understood each right as it was read to him. Detective Frias
testified that Appellant had not been deprived of food, drink, or sleep, nor
coerced or threatened into participating in the interview.  Giving due deference to the trial court=s findings of fact and viewing the totality of the circumstances, we
hold that the trial court did not abuse its discretion in finding that
Appellant voluntarily waived his rights. 
See id.  Accordingly, we
overrule Appellant=s first
issue.

EVIDENCE








In his second and third
issues, Appellant complains that the trial court erred in admitting certain
gruesome photographs, and that there was insufficient evidence, as a matter of
law, to convict him of his wife=s murder.

Admission Of Evidence 

Appellant argues in his third
issue that the trial court abused its discretion by admitting, over his
objections, the Agruesome@ photographs in State=s Exhibits 5 and 9-28, both individually and cumulatively, because
their probative value was far outweighed by their unfair prejudicial effect,
under rule 403.  See Tex. R. Evid. 403.

Preservation Of Error








To preserve a complaint for
appellate review, the record must reflect that the complaint was made to the
trial court and either that the trial court ruled on it, expressly or
implicitly, or that the appellant objected to its refusal to do so.  Tex.
R. Evid. 103(a); Tex. R. App. P.
33.1(a)(2); Gutierrez v. State, 36 S.W.3d 509, 510‑11 (Tex. Crim.
App. 2001); Darty v. State, 709 S.W.2d 652, 655 (Tex. Crim. App.
1986).  Appellant has failed to preserve
his complaint with regard to Exhibit 5 because, after taking the sponsoring
witness on voir dire, he stated that he Awould have no objection to Exhibit 5.@  The trial court subsequently
ruled that Exhibit 5 Awill be
admitted without objection,@ and  then noted and overruled
Appellant=s objections
to Exhibits 9-28, admitting all of them into evidence.  We overrule Appellant=s third issue as it concerns Exhibit 5.

Standard Of Review

When determining whether
photographic exhibits were properly admitted, the question is not whether the
exhibits are more prejudicial than probative, but rather, whether the probative
value of the photographs is substantially outweighed by the danger of
unfair prejudice.  Salazar v. State,
38 S.W.3d 141, 151 (Tex. Crim. App.), cert. denied, 534 U.S. 855 (2001);
see also Tex. R. Evid. 403.  We review a trial judge=s rule 403 decision for an abuse of discretion, meaning it will be
reversed only if the decision is outside the zone of reasonable disagreement.  Salazar, 38 S.W.3d at 151; Narvaiz v.
State, 840 S.W.2d 415, 428-29 (Tex. Crim. App. 1992), cert. denied,
507 U.S. 975 (1993).

Photographic Evidence








Rule 403 requires an
admissible photograph to possess Asome probative value and that its probative value not be substantially
outweighed by its inflammatory nature.@  Santellan v. State, 939
S.W.2d 155, 172 (Tex. Crim. App. 1997). 
We consider these general rule 403 factors: (1) the probative value of
the evidence; (2) the potential to impress the jury in some irrational, yet indelible,
way; (3) the time needed to develop the evidence; and (4) the proponent=s need for the evidence.  Erazo
v. State, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  And in the context of the admission of
photographs, we also consider the following nonexclusive list: the number of
exhibits offered, their gruesomeness, their detail, their size, whether they
are black and white or color, whether they are close‑up shots, whether
the body is naked or clothed, the availability of other means of proof, and
other circumstances unique to the individual case.  Id.; King v. State, 189 S.W.3d
347, 355 (Tex. App.CFort Worth
2006, no pet.).

Appellant does not allege any
tampering or enhancement of the photographs in an attempt by the State to
inflame, confuse, or mislead the jury. 
Indeed, his primary argument is that the introduction of the
photographic evidence Awas
completely unnecessary,@ because the
crime scene investigator testified that she could explain where blood samples
were obtained from her diagram, Exhibit 29, without the bloody photographs.








While crime scene
investigator Smith did testify that she could tell the jury where she collected
various samples of blood by using a diagram, photographs 9-28 reveal much more
than the mere location of blood sampling. Smith indicated that the photographs
panned across the bedroom in progression, showing more parts of the crime scene
in each photograph.  She described the
crime scene as the north bedroom and an open bath area on the east side,
consisting of a sink and a mirror.  She
testified that when she entered the bedroom, she saw an initial pool of blood
at the entrance to the bedroom, the victim lying face up, and blood stains all
over the bedroom.








Smith testified that Exhibit
9 was Ajust a close-up of the victim.@  Exhibit 9 shows a close-up of
the victim=s head and
upper torsoCher white
shirt is drenched red with blood and there are dried blood spatters on her face
and a pool of blood on the carpet near her neck.  Smith testified that Exhibit 10 was a view of
the bedroom, close to the entry of the bedroom at the door.  Exhibit 10 shows the victim=s torso and lower body and the extent of blood stains on the carpeted
floor.  Smith testified that Exhibit 11
showed the victim=s head in
relation to the bedroom closet door and showed blood spatter on the walls which
was consistent with the rest of the room. 
She testified that Exhibit 12 was a head-on view of the closet door with
a ruler showing the scale of the blood spatter on the closet door.  It also shows smears of blood on the wall.
She testified that Exhibit 13 showed the north wall of the open bathroom area
with the victim at the bottom of the photograph.  It also shows more blood stains on the carpet
in that open bathroom area and blood spatters and smears on the wall in the
open bathroom area.  Smith testified that
Exhibit 14 showed more of the bathroom area and the floor.  It also shows the bloodstains on the open
bathroom area carpet and blood spatters on the open bathroom area=s cabinet doors.  She testified
that Exhibit 15 was Ajust a better
view of the open bathroom area,@ and shows the knife.  It also
shows the spatter of blood on the top of the open bathroom area=s counter and on the mirror.

Smith testified that Exhibit
16 was a closeup of the front counter of the bathroom sink.  It also shows how blood dripped down the
cabinets and spattered throughout the area and a small pool of blood on the
carpet.  She testified that Exhibit 17
showed the overall view of the bathroom, including a better image of the mirror
and the opposite wall of the bathroom, and a palm print on the mirror.  It also shows the knife clearly.  She testified that Exhibit 18 was a view of
the north wall of the open bathroom with the ruler for scale. She testified
that Exhibits 19-22 showed the top counter of the bathroom sink. They show
different parts and angles of the top counter and the sinkCthere are drops of dried blood on the sink and the counter and everything
on it.








Smith testified that Exhibit
23 showed a close-up of the sink and mirror, with a closer image of the palm
print, that Exhibit 24 showed the south wall in the open bathroom area, and
that Exhibits 25 and 26 were better images of the knife on the floor, taken at
different angles.  She testified that
Exhibit 27 was a closeup of the knife at the scene and Exhibit 28 was a
photograph of the knife in the lab, including a ruler for scale.  Smith testified that the knife was approximately
twelve inches in length, with a blade of seven to eight inches. Before Exhibits 9-28 were admitted, the trial
court admitted Exhibits 6 and 7 during Cardoso=s testimony, over Appellant=s objections under rule 403. Exhibit 6 is a photograph of the crime
scene from the hallway facing into the bedroom and Exhibit 7 is a closer view
from a different angle.  Cardoso
testified that the young lady in the photograph was the one he had described
earlier in his testimony.  Exhibit 8 is
similar to Exhibit 7, but taken from a different angle. The jury could have found Exhibits 9-28 highly probative with regard
to the manner in which the murder occurred.  See Erazo, 144 S.W.3d at 489. Smith=s terse descriptions of the photographs failed to capture the entirety
of the brutal act and its wide-ranging scope throughout the bedroom and open
bathroom area.  While these photographs
had the potential to impress the jury in an irrational way because of their
graphic nature, they were not as descriptively gruesome as Roper=s testimony, for example, that there was blood six or seven feet high
on the walls.  Id.  The body was not naked, and the time taken to
develop the evidence was minor in relation to its ability to put all of the
testimony in context.  Id.  All of the photographic exhibits, 9-28, were
in color, 18 inches x 20 inches, mounted on black cardstock.  Given the nature of the murder, they were not
unduly gruesome, but did demonstrate the ruthlessness involved in killing the
victim.  








In Chamberlain, the
court of criminal appeals faced the same complaint from an appellant, about
eight color photographs of a particularly brutal murder, in which the appellant
had bound the victim with duct tape, sexually assaulted her, shot her in the
forehead, and then left her semi-nude body on her bathroom floor.  Chamberlain v. State, 998 S.W.2d 230,
232, 236-37 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082
(2000).  The photographic exhibits
included closeup shots of the victim=s face with brain matter extruding through the large wound on the side
of the head, of torn skin around the bullet wound to the head, of the exit
wound in the back of the head, and of the victim=s duct-taped hands.  Id.
at 236‑37.  The court responded by
rejecting the premise that visual evidence accompanying oral testimony would be
cumulative of the testimony or of insignificant probative value.  Id. at 237.  The court stated,

Visual evidence accompanying
testimony is most persuasive and often gives the fact finder a point of
comparison against which to test the credibility of a witness and the validity
of his conclusions.  Nor do we agree with
appellant=s assertion
that the photographs are inflammatory. 
The photographs are gruesome in that they depict disagreeable realities,
but they depict nothing more than the reality of the brutal crime
committed.  And it is precisely because
they depict the reality of this offense that they are powerful visual evidence,
probative of various aspects of the State=s case.








Id.  Because the same reasoning applies to the
case before us, we cannot say that the trial court abused its discretion by deciding
that the photographs= probative
value here was not substantially outweighed by the danger of unfair
prejudice.  We overrule Appellant=s third issue.

Legal Sufficiency Of The Evidence

In his second issue,
Appellant argues that the trial court erred by denying his motion for a
directed verdict and claims that there was insufficient evidence as a matter of
law to convict him.[10]

Standard Of Review








In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  To commit a murder, the person must either
intentionally or knowingly cause the death of an individual, or intend to cause
serious bodily injury and commit an act clearly dangerous to human life that
causes the death of an individual.  Tex. Penal Code Ann. ' 19.02(b)(1), (2) (Vernon 2003).

The trier of fact is the sole
judge of the weight and credibility of the evidence.  See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 
Thus, when performing a legal sufficiency review, we may not re‑evaluate
the weight and credibility of the evidence and substitute our judgment for that
of the fact‑finder.  Dewberry v.
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529
U.S. 1131 (2000).  We must resolve any
inconsistencies in the evidence in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406
(Tex. Crim. App. 2000).








Viewing the evidence in the
light most favorable to the verdict, we conclude that the jury could have found
that Appellant murdered his wife, based on his oral and written confessions,
including his statement that no one else was in the apartment when he cut his
wife, testimony by Gabriela about their marital problems and that the apartment
did not look like anyone had broken in or that anything had been stolen, other
witnesses= testimonies
about the night of the murder, and the evidence collected by the police,
including the knife, Appellant=s palm print on the mirror, and the photographs of the scene. The jury
reasonably could have chosen to believe Appellant=s confession and resolved the presence of a third person=s DNA and fingerprint through the various witness testimonies about
the number of people who had been in the bedroom before the crime scene was
secured by the police.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Margraves, 34 S.W.3d at 919.

Thus, resolving any
inconsistencies in the evidence in favor of the verdict, we hold that there was
legally sufficient evidence for the jury to conclude that Appellant committed
the murder and to convict him.  See
Curry, 30 S.W.3d at 406; Dewberry, 4 S.W.3d at 740.  We overrule Appellant=s second issue.

 

 

 

 

 

 

 

 

 

 

 

 








CONCLUSION

Having overruled all of
Appellant=s issues, we
affirm the trial court=s judgment.

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
B:  HOLMAN, GARDNER, and WALKER, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  May 3, 2007

 











[1]See Tex. R.
App. P. 47.4.





[2]Arlington Police Detectives Richard
Nutt and David Frias testified that they attempted to contact the consulate
before interviewing Appellant.  Detective
Nutt testified that he tried to leave a message that Appellant was being held
and charged with murder.  Detective Frias
testified that he received a phone call from the consulate five days after the
interview.





[3]While neither party moved for
written findings of fact and conclusions of law, and none were filed, it is
apparent from the record that the trial court intended for its findings and
conclusions to be expressed via its oral pronouncements.  In reviewing a motion to suppress, oral
findings of fact can be considered as findings of fact on the record and given
due deference.  See, e.g., Flores v.
State, 177 S.W.3d 8, 13 (Tex. App.CHouston [1st Dist.] 2005, pet. ref=d) (reviewing trial court=s oral findings of fact on a motion
to suppress), cert. denied, 126 S. Ct. 2298 (2006).





[4]After the trial court denied
Appellant=s suppression motion, Judge Maddock
and Detectives Nutt and Frias presented essentially the same testimony to the
jury.





[5]Appellant also raises article I,
section 10 of the Texas Constitution as guaranteeing his right to counsel.  However, we will only address whether
Appellant=s rights were violated under the
U.S. Constitution because Appellant does not distinguish those rights from his
rights under the Texas Constitution.  See
Dewberry v. State, 4 S.W.3d 735, 743‑44 (Tex. Crim. App. 1999) (addressing
only U.S. Constitution because appellant failed to distinguish those rights
from rights under Texas Constitution), cert. denied, 529 U.S. 1131
(2000).





[6]The English language copy of the
rights that Judge Maddock translated for Appellant in Spanish was subsequently
admitted as an exhibit after the suppression hearing and Judge Maddock read the
rights aloud in English to the jury. 
Judge Maddock testified that she routinely used a Spanish translation
form that was provided to the City by Tarrant County, and that she used it Aday in, day out.@ 
She testified that she learned English when she was four years old and
that her parents, who were originally from Cuba, did not know English. She was
not a certified interpreter licensed by the State of Texas.

After the suppression
hearing, Judge Maddock additionally testified that she was fluent in Spanish, a
native Spanish speaker, and had lived in Barcelona, Spain, and Mexico City,
Mexico, for part of her life.





[7]Judge Maddock testified that the
only writing on Appellant=s waiver of counsel form when she
left was what she had written on the bottom of the document.  Her notation reads, AUnable to sign.  Per court motion, appoint defendant an
attorney,@ with her signature and the
date.  She testified that when she wrote Aunable to sign@ on State=s Exhibit 48, she was referring to
the financial documents that usually need to be completed to determine
indigency and that she was waiving the requirement of those documents.  State=s Exhibit 48 was subsequently admitted into evidence for
all purposes without objection. 





[8]Apparently, Appellant asked about
an attorney only before the interview, in the notation with his waiver of
counsel, and at the end of the written statement, with the same notation: AYo pregunte por un abogado pero
tambien quiere hablar con la policia de Arlington.@ 
The trial court=s interpreter translated this as, AI asked for a lawyer, but also I
wanted to speak with the Arlington police.@





[9]He also testified that he was not
advised of his right to contact the Mexican Consulate when, after leaving the
hospital, he was booked into the Tarrant County jail, or when he was booked
into the Dallas County Sheriff=s Department.  In
Exhibits 55 and 56, the State presented evidence, admitted for impeachment
purposes, that Appellant was notified of his consular rights at both
bookings.  On Exhibit 55, the Tarrant
County jail consular rights notification sheet, Appellant circled Ano@ in answer to the question ADo you wish for us to notify the
Consulate officer of your country?@  His inmate number
is listed on it.  On Exhibit 56, after
information about consular rights, there is a check mark next to an option that
states, AThe person arrested then stated that
he did not wish notice of this arrest to be sent to the consular officials of
his country.@





[10]A challenge to the denial of a
motion for instructed verdict is actually a challenge to the legal sufficiency
of the evidence.  Canales v. State,
98 S.W.3d 690, 693 (Tex. Crim. App.), cert. denied, 540 U.S. 1051
(2003); McCown v. State, 192 S.W.3d 158, 160 (Tex. App.CFort Worth 2006, pet. ref=d).